The estate of Dustin Barnwell, by next of kin SCB, a minor, by next friend Shasta Claché Gilmore v. Mitch Gritsby, et al., for argument not to exceed 15 minutes per side. Mr. Thompson for the defendant's out. Good morning. May it please the court. Good morning. I'm Jeff Thompson from Knoxville, Tennessee, here representing the appellant's officers Richard Stooksberry, Officer Mitch Gritsby, and also paramedics David Randall and Robert Cooker. I appreciate the opportunity to argue before the court today, and I would like to reserve three minutes of my time for rebuttal. In this qualified immunity appeal, the district court correctly found the facts in the light most favorable to the plaintiff, but then applied an incorrect legal standard to those facts. This case involves two officers who responded to a 911 call from the plaintiff about a combative patient. The officers struggled with that patient until two, actually four paramedics arrived, and ultimately those paramedics also struggled with the patient. The patient was handcuffed and restrained, and ultimately the paramedics performed a rapid sequence intubation according to their protocol. The district court regarding the officers found that the officers, officers Stooksberry and Gritsby, that their restraint did not constitute excessive force and granted qualified immunity on the excessive force as to their restraint. However, the district court denied qualified immunity to the officers based on their alleged role in administering one of many drugs that were given in the RSI protocol, suctional choline. In fact, the administration of this one drug in a lengthy almost two-page protocol is the entire basis for the denial of qualified immunity to all four defendants in this case. However, there is no competent evidence in the record that the officers had any role whatsoever in administering any drug. The district court unfortunately cited two allegations in the complaint and not to facts. The only inkling... There's why, that's, that puts this court in a tough spot. The dispute on the facts, do we have jurisdiction to look at that case, that issue? Yes, Your Honor. Under Mitchell v. Forsyth and a recent case, I believe we cited Deluzio from this court. The court can certainly, we are not disputing in any way the facts, Your Honor. In fact, we... In brief, you do, over and over. Well, Your Honor... Even in the argument here, you say the alleged this or that. And we don't, the district court, we don't find facts here. The district court said no qualified immunity on certain factual grounds, but your brief disputes the facts. Your Honor, our brief certainly in certain instances points out if plaintiff talks about a certain fact and the fact is not in the record, then we have pointed out that no, that fact is not in the record. That makes it what? Disputed? Your Honor, I would respectfully disagree if a fact is claimed, but it was never put into the record, then it's not really a fact. It's an allegation. Well, the complaint. The complaint sets forth their claims, right? That's correct, Your Honor. Where is it in the record? I'm sorry, you're saying it's not in the record? Many of the facts cited or the allegations made are not facts in the record, Your Honor. And we have made that point in our brief. But aren't there cases that say that the issue whether the court properly found a genuine issue regarding a specific fact is not appealable? There are cases, absolutely, Your Honor. And that's what you're talking about. Respectfully, Your Honor, what we're saying is we accept as true every single fact that the district court found in the opinion. What we're saying is that there was incorrect legal conclusion drawn from those facts. And, for instance, in many places in the opinion, the court states that there is a dispute about what the intent of the officers and the paramedics was. In fact, that's the major thrust of this entire argument. The court in several places says the court cannot determine whether there was a punitive intent or not a punitive intent from the facts. So, therefore, the court's not going to grant qualified immunity. We submit respectfully that that is an incorrect legal standard. The correct legal standard is not the subjective intention of the officers, but the objective reasonableness of their actions. And that's the thrust of our appeal. We're not in any way disputing any of the facts as set forth by the district court. And we're not disputing the facts in the light most favorable to the plaintiff. However, as many courts have held, an allegation is not a fact. And, additionally, some of the facts, the district courts found that some of the facts were not material. And I want to get to, the only inkling, of course, is of the statement, the only inkling that the officers, in this case, had anything whatsoever to do with an administration of a drug. Which, I mean, frankly, it sort of defies common sense that an officer could tell a paramedic, you know, let's give them a certain drug. He doesn't know anything about that. But the only inkling in the record is an alleged statement that Officer Stukesbury made. And we want the court to take that statement as true. Alleged statement. It's true. It sounds like, doesn't it sound like a disputed fact? No, Your Honor, it's true. It's true. Take that back. I apologize for using the word alleged. It's true. For purposes of this argument, it's true. The officer said, we're going to knock him out. That's a true statement for purposes of this appeal. However, the court has to draw a reasonable inference from that statement. And we've cited cases, Tolan v. Cotton is a more recent one. The court, that's a U.S. Supreme Court case. If the court cannot base the denial of a qualified immunity claim on an inference, that is not reasonable. And in this case, Your Honor, we would submit that a single statement. The inference here that you say is we're going to knock him out. The reason that inference. That's just unreasonable as all get out. Because the inference you say that is unreasonable is now we've become a team here. These paramedics and we officers are a team. We're trying to help with this big situation. Right? Let me explain. That's unreasonable. Let me explain why the inference is unreasonable that that statement led to the paramedics, quote, using this drug. The reason it's unreasonable. Oh, yes. I agree. The choice to use a drug. Right. The reason that's an unreasonable inference is everyone in the case has testified we didn't hear it. We didn't act on it. We didn't know he said it. And even according to plaintiffs, he wasn't anywhere near the patient when he made the statement. He just accepted it as true. Correct. And now we're saying, but everybody else thinks it really wasn't. Oh, everybody else thinks it's true. They all say we didn't hear it. We didn't act on it. We don't know anything about it. It can be true, but someone else didn't hear it. If no one acts on it, then what difference does it make? If someone says the statement, even according to plaintiffs, and the facts in the light and most favor of the plaintiffs, the statement is made away from the scene, and the paramedics didn't hear it, couldn't have heard it, and had no reason to act on it and didn't act on the statement. So accordingly, Your Honor, I would respectfully suggest that if the district court used that statement as the reason to deny qualified immunity, that was not a reasonable inference for the court to draw in order to deny qualified immunity. I'd also like to touch briefly on the paramedics. Again, the Rowan County, Tennessee, has a rapid sequence intubation protocol that was developed by the EMS medical director, who is a physician. The protocols are nearly 200 pages long, and they're used so that paramedics in the field who are not doctors have a written set of guidelines on how to quickly assess patients and act quickly, save lives. The RSI protocol states that the indications to use it are acutely head-injured patients that are combative, unable to control the airway, or severely combative patients that cannot be controlled without injuring to the patient. The district court, in the next to last section of its opinion, found that the policy was not unconstitutional. The undisputed facts and the facts as stated by the trial court are that Barnwell was severely combative and could not be controlled. Accordingly, it's our argument, respectfully, that paramedics Cooker and Randall were correct to implement the RSI protocol, and in fact had to implement the protocol in order to comply with their policy. And one of the... Of course, there's a medical expert who said when a person, a combative person, is in this state and is breathing, then we don't paralyze his lungs and throat, whatever it was. That's correct, and that was in his affidavit. In his deposition, he later said that the protocol, as written, is exactly the protocol that he uses. He agrees with it. He agreed with the protocol, as I get it. Correct. And I think as the district court probably got it, he agreed that the protocol is the way to go, yet it's not called for here. And, Your Honor, respectfully, the court found that the plaintiff or the patient was severely combative. The protocol in it, in the policy, it says use this if the person is severely combative. So respectfully, and we've cited some cases in our brief, an expert can't come in and say the expert's opinion on what's objectively reasonable, it's irrelevant. The protocol itself says if the plaintiff is combative, use the protocol. If a policy is constitutional and the government actor follows that policy to the letter, which is undisputed, then it is impossible for the government actor to violate the constitution. It simply can't be. Instead of noting that the paramedics in this case followed the policy, the district court instead, again, entered this subjective idea of, well, I can't determine the intent of the actors in this case, whether they had an intent to be punitive or whether they had an intent to treat, and therefore I'm just going to deny qualified immunity. I see that my time is up and I'll reserve it. Okay. Thank you, Mr. Thompson. I'm Whitney Durand and I'm from Chattanooga, not Knoxville, though Mr. Wolf and I are trying the case in Knoxville. In the primary brief of the appellant, the word undisputed appears 60 times. In the reply brief of the appellant, the word undisputed appears 35 times. In our brief, it appears zero times. And there's a reason for that. Everything in this case is disputed. It starts from the first act by the first person. So even that's a dispute, right? The fact that it is a dispute, I mean, it's not. If counsel takes the position and he accepts all your facts, then we have jurisdiction, do we not, to look at this denial of qualified immunity. Frankly, that's our interest. What do we have jurisdiction? I don't think either of you spent very much time on the elephant in the room, which is whether this court has jurisdiction. I think we spent three pages on it. And the reason was that we don't think you do have it. The facts by the judge were that there is a dispute. And she couldn't decide the case. You heard counsel's argument. She was mistaken in saying that because she's drawing unreasonable conclusions about the limitation of her ability to come to a conclusion here. From the undisputed facts, she drew unreasonable conclusions. I understand the argument. I just don't agree with it. And the reason, again, is all the facts are disputed. Now, they may say now that they agree with everything the judge said, but 95 times they used allegedly undisputed facts. Oh, I didn't know you. You said they said undisputed, undisputed. Undisputed, undisputed. Okay, well, allegedly undisputed, which did they say? Those are two really different things. They said that... I didn't count them. You did. What word were you counting? What words? Was it a phrase or a word? Undisputed. Okay. So that's the way to get our attention, undisputed. What I'm saying is they are disputed. Okay. And, therefore, because the judge found that the facts needed to be resolved by a jury, you don't have jurisdiction. Okay, so they're relying on the fact that he was combative. Was he? Not in the meanings that matter here. I'll start with the facts as they started. His girlfriend and the mother of his child did use the word combative in her 9-11 phone call. She didn't call for police. She called for an ambulance. Who showed up? Two deputies, two sheriff's deputies. They weren't asked by her or, as far as the record shows, by anybody. Yeah, but that may not be an unusual occurrence in different departments where police are dispatched to be there in support of the paramedics. I don't know. There's not even evidence that they were dispatched. They may have been listening to a radio, and one of the officers, one of the deputies, knew the defendant. And maybe he wanted to get there and get in on the action. But there's no evidence here. I know we're talking about a lot of disputes, but no indication that there was some prior contact that one of the officers had with Mr. Barnwell. But is there evidence there was some sort of ill will that the officer showed up for some improper purpose or something of that nature? The prior history between the two is the evidence. Okay. And it consists of stop him, pulling the weapon of the officer, but then not arrest him in a traffic offense. Then at the jail on a separate offense, the same officer manages to assault him, and that was the history between the two of them. I mean, you would agree, though, I mean, it's just not terribly out of the ordinary that officers might support paramedics who have been dispatched somewhere. If they're asked to come. Well, maybe they hear it over the radio, and they hear something about a combative nature of a person in distress. I don't know that this is a point worth belaboring, but it just seems to me that it's not all that out of the ordinary that officers might show up. Though maybe in this case, as you say, given the history of Mr. Barnwell and the one officer. It's curious. Okay. Now, when they got there, the deputies, the man was asleep. Now, supposing he was lying on the couch. Supposing that he was. A sleeper comatose. All we know is he was asleep. He was lying down on the couch. Okay. At the time the officers got there, they didn't know what his condition was. Now, what I would have expected, and I believe most people would expect, is that the deputies would wait for the medics to arrive. They didn't do that. They started right away on police work. You know what? We aren't the jury. You know that. We're here about a couple legal issues. So that's an argument I expect you want to present to the jury, that the officers weren't called. Are we getting to the undisputed facts here? Well, they're set out at some length in the trial court's opinion. And she found, mistakenly we believe, that the officers acted properly in hog tying or making the patient. Granted qualified immunity on that. Yeah. And the reason I believe she made the mistake is that she doesn't cite the fact that he was face down. I didn't know. Do you have a cross appeal on that? We tried. But, I mean, is it before us today? I didn't think it was. Okay. Well, let's stick with what we have. Okay. Now, they did not ask for, no one asked for consent to any form of treatment. The medics didn't ask for it. The deputies didn't ask for it. Now, when asked by the, at the deposition, what consent was there, the chief medic said, or cited the protocol relating to consent when children are involved. Nobody asked the girlfriend. Nobody asked the mother defendant. Nobody. They just acted. They did what they wanted to do as both deputies and as medics. Now, later in the case when the real injury occurred, the greatest injury occurred, a paralytic drug, something called clothing, was used. It may have been used pursuant to the protocol, but contrary to what you heard earlier, that protocol does not require it to be used. It's a matter of discretion upon the part of the medics who are applying it. We're told by your colleague here that it is prescribed for, you know, the protocol says administer this for a combative individual. It doesn't say that. That's disputed. It says severely combative. And what I'm saying is that's still only permissible. If he is severely combative, there is no requirement that a paralytic drug be used. It's permissible. I mean, really, to be guilty of a constitutional violation, it has to be within the realm. And it sounds like you agree that it was one of the prescribed reasons for engaging this protocol. And the combativeness is one of the prescribed. It doesn't say thou shalt, right? It doesn't say that. But if it's within the realm of constitutionality, there's nothing prescribed that's unconstitutional about that in having followed this protocol. It's followed in an unconstitutional way. I see. The protocol is not itself unconstitutional, and it's widely used. No, I meant one who follows it. Go ahead. You concede that he was severely combative. No. We say that what he did was to act in a way that people who are under the influence of a drug, which, by the way, required over 3,000 pills in order to become fatal, he used eight. But at any rate, his condition was ambiguous at best. He may have been sleeping. He may have been unconscious. We don't really know. All we know is that as soon as he got there, he was placed under control first of the officers and then of the deputies and then the medics. But back to the policy, it wasn't an unconstitutional policy, but the officers could, and the judge said she did not know, could have applied it with a punitive intent. What they could have done is to go through this series of drugs and stop at any point before they got to the really dangerous one. Versed, according to the physician who testified, would have been a good place to stop, and you wouldn't even get to the drug that caused the death. Judge White asked you if you concede that Mr. Barnwell was combative, and you said something to the effect that you would concede that he acted, I think, consistently with the drugs that he had taken. Can you tell me what you mean by that? I know we're treading on a lot of, again, facts that may be in dispute, but I assume you concede that Mr. Barnwell did not remain comatose. At some point he became active and demonstrated some degree of action, whether you characterize it as being combative or something else. Can you tell me what you mean by that? His arms were behind his back. He was prone. That's a dangerous position to be in. Well, even before that, he was apparently either comatose or asleep when the officers arrived, and they attempted to wake him and claim that he became combative and tried to bite him and things of that nature. You contest that completely, that he awoke, that he did anything, took any action at all that might require them? He said he can't breathe. He was face down on the floor. Okay. So, again, that's the kind of thing where a judge has to, a trial judge, or the trial jury has to say what exactly he said because that's in dispute. And by the way, there are a lot of people in the room when this happened, two of his friends, his girlfriend, the girlfriend's mother, his child, plus six officers and medics. Now, it isn't an idle comment that we're going to knock him out. Deputy Stokesbury said it three times. He said it first to Barnwell himself, we're going to knock you out. Then he said it to the family and friends of Barnwell. And finally, he said the same thing while Barnwell was on a stretcher, ready to go to the hospital. So this is the same deputy with whom there was a history of some confrontation before. Now, what this means is that the deputies violated the, and the paramedics violated the Constitution at the stage when the paralytic drug was administered because of the intent. And there is case law to support it. The punitive intent is a jury issue, and that dictates the constitutional violation. Your claim has a state-created danger theory, does it not? And that is a theory that hinges on a private person inflicting injury. There's the private person here. Well, every single one of the six people was a state actor. And we can employ the same argument when there's no private person involved. There were four paramedics. I don't think you addressed it in your brief to give us a case that supports liability for a non-private person under that theory. Is this an aspect of your excessive force claim, or do you see it as a separate claim? I see it as a commingled claim of a constitutional violation because of the excessive application of force with the punitive intent. I'm losing you. Can you speak louder? You see it as? The conjunction of two theories. So it's part of the excessive force claim? Yes. And again, what we're saying is that the tube went down the wrong path. Which private individual inflicted this harm? Under that theory, you need harm inflicted by a private individual. There is no private individual. So the theory has no basis here. It has application by logic to public actors as well as private actors. No. No, it doesn't. So if there's no private actor, you aren't able to tell us one. And you're welcome to submit. If it's all right with my colleagues, you can submit some support for that. But they're in the next, make it in ten days. But we don't see, I don't think you even argued a private individual. Today you said, no, these are all public people. By whatever they were doing, they acted for the government. And they did, and they increased the risk to the victim. These government people. So that's your theory. There's no private individual involved. There's not. Okay. Then don't bother with, I mean, we have your answer. We don't need any further. We've got that. Okay. Apparently no further questions. Thank you. I'd like to just briefly jump back to the jurisdictional argument. It struck me as I was reading all these cases on qualified immunity that typically what the Sixth Circuit and all the circuits do is they say, well, here are the facts that the trial court found. And that's all what we're asking the court to do here is take those facts, those same facts, and correctly apply the law. We can do so long as the parties don't quarrel with those facts. Your Honor, we are not quarreling with the facts. Unfortunately, you know, part of the problem, you know, we just heard something about, well, maybe they wanted to get in on the action, or, you know, that's just an allegation. That's not a fact. The court can only look at facts. And in this case, the court correctly found the facts. There's a dispute about what is the fact. A factual dispute by any other name. There's not a dispute about what the facts are, Your Honor. The fact the district court found all the facts, where the district court erred was, and I've marked this spot in the opinion, and I'll quote, the medical necessity of such a procedure and the paramedic's intent in performing it present material questions of fact. And what our argument is, the intent of the paramedics is not a question of fact. That's an incorrect application of the law. Someone's intent is not relevant to this case. The only thing that's relevant under Graham is objective reasonableness. And, again, on the next page, the court, again, sort of punts the question and says, again, this case revolves around whether they paralyzed Mr. Barnwell to provide medical care or to punish him. Again, this question centers on intent, not the objective reasonableness of the actions. And are you distinguishing between the officers and the paramedics in making this argument about the facts? Well, no, Your Honor. I think it's the same argument, and we sort of keep getting off into talking about, well, what happened when the officers got there, and did he struggle? Well, that's really not relevant to this appeal, Your Honor. The district court has already found that the use, the restraint, and the use of force was acceptable, and has already granted qualified immunity on that. The only thing that we're here about is whether the use of the drug, which was in the protocol, in which the district court has found that the plaintiff was severely combative. So if the district court has found that the plaintiff was severely combative, and there's a constitutional policy that says this is what you do when someone is severely combative, then from an objectively reasonable standpoint, the paramedics implementing that policy could absolutely not have done anything that was unconstitutional. And that's the crux of our argument, Your Honor. Was there any other questions? Apparently not. All right, I thank the court for its time. Sure. And thanks to both counsel for your arguments today. We really do appreciate them. The case will be submitted.